# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
**ZENAIDA HERNANDEZ,**                    )
                                          )
    **Plaintiff,**                 )
                                          )    **Civil No.**
    **v.**                         )    **12-11062-FDS**
                                          )
**MARIA E. MONTANEZ, MARK A.**            )
**VERDINI, JONATHAN W. THOMAS,**          )
**CARLOS M. GODEN, JR., and ANTHONY**     )
**MENDONSA,**                             )
                                          )
    **Defendants.**                )
                                          )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

    This is a civil rights action arising out of the strip-search of a prison visitor.  Plaintiff
Zenaida Hernandez alleges that several corrections officers at the Souza-Baranowski
Correctional Center illegally seized and searched her when she visited the prison.  The complaint
alleges violations of 42 U.S.C. § 1983; the Massachusetts Civil Rights Act ("MCRA"), Mass.
Gen. Laws ch. 12, § 11I; and the Massachusetts Privacy Act ("MPA"), Mass. Gen. Laws ch. 214,
§ 1B.  The named defendants are Maria E. Montanez, Mark A. Verdini, Jonathan W. Thomas,
Carlos M. Goden, Jr., and Anthony Mendonsa.

    Defendants have moved for summary judgment, contending that (1) they are entitled to
qualified immunity, (2) they did not violate plaintiff's Fourth Amendment rights, and (3) they
did not violate the MPA.  For the following reasons, defendants' motion for summary judgment
will be granted in part and denied in part.

I.      **Background**

A.      **Factual Background**

The facts summarized below are undisputed or construed in the light most favorable to the non-moving party.[1]

1.      **The Anonymous Tip**

Souza-Baranowski Correctional Center is a state prison in Shirley, Massachusetts.  (Pl. SMF ¶ 2).  On September 11, 2011, Anthony Mendonsa became the superintendent of SBCC. (Mendonsa Aff. ¶ 1).   The smuggling of drugs into the SBCC prison population by visitors is a serious concern for the institution's staff.  (*Id.* ¶ 3).

At that time, SBCC was experiencing an increase in the introduction of the drug suboxone into the institution.  (Def. SMF ¶ 1).  Suboxone comes in the form of tablets or strips; the tablets can be crushed into a powdery substance that, at the time, was easily concealed and smuggled into SBCC by visitors.  (*Id.*).

SBCC's Inner Perimeter Security team investigates breaches of security within the institution, including the introduction of drugs by visitors.  (*Id.* ¶ 4).  IPS has an unrecorded hotline that can be used by any inmate in the institution to provide confidential or anonymous information.  (*Id.*).

On Friday, September 16, 2011, IPS Officer Mark Verdini received an anonymous tip on

---

[1] The parties have put forth somewhat different versions of the circumstances surrounding the strip-search in this case.  When deciding summary judgment where a party claims qualified immunity, "[w]hat counts is whether the undisputed facts, together with the nonmoving party's version of any disputed facts, suffices to remove the shield of qualified immunity."  *Moses v. Mele*, 711 F.3d 213, 216 (1st Cir. 2013).  In this situation, the court should take the "cautious approach" and "assume[] for argument's sake that all disputes about material facts should be resolved in the plaintiff's favor."  *Id.*  Accordingly, the Court considers the motion for summary judgment on the facts in the record as construed in the light most favorable to plaintiff.

the IPS hotline that Albert Jackson, an inmate in SBCC, was going to receive a large amount of suboxone from a female visitor on Sunday.  (*Id.* ¶ 5).  The inmate caller did not identify himself.  (*Id.*).  Verdini did not know the caller's identity, recognize the caller's voice, or know how the caller knew this information.  (Pl. SMF ¶ 16).

Jackson had a reputation among other inmates and corrections officers of being involved in drug activity at SBCC.  (Def. SMF ¶ 7).  Verdini was aware of that reputation.  (*Id.*).

Verdini confirmed, based on the visiting schedule, that Jackson's next visiting period was that Sunday, September 18.  (Pl. SMF ¶ 16).  Prison records show that Jackson had many visitors while incarcerated; in 2011, he had more than a dozen different female visitors.  (*Id.* ¶ 18).  SBCC inmates receive the most visitors during the week on Sundays, and a majority of those visitors are women.  (*Id.* ¶ 17).

Verdini notified IPS Commander Nestor Cruz about the call.  (Def. SMF ¶ 6).  Later that day, Verdini, Cruz, and IPS Officer Jonathan Thomas had a discussion about the anonymous telephone call and Jackson's history with drug activity in SBCC.  (*Id.* ¶ 9).  They discussed an incident that had occurred 18 months earlier, where one of Jackson's visitors had been found in possession of marijuana during a contact visit.  (Pl. SMF ¶ 19).  That incident had occurred in the regular visiting room.  (*Id.* ¶ 20).  Corrections officers monitoring the visit had observed suspicious activity between Jackson and his visitor and terminated the visit.  (*Id.*).  When the officers questioned the visitor, she turned over a small bag of marijuana.  (*Id.*).

Although not discussed at the time, Thomas was also aware of an incident where an inmate who owed Jackson money was stabbed.  (Def. SMF ¶ 11).  When he was asked what the debt was for, he said it involved drugs.  (*Id.*).

Cruz instructed Verdini and Thomas to report to work on September 18 and stop Jackson's visitor before she entered the secure part of the institution.  (Def. SMF ¶ 16).

According to Hernandez, neither Verdini nor Thomas did anything to investigate or corroborate the anonymous tip.  (Pl. SMF ¶ 22).  Both officers knew that Jackson had enemies in SBCC.  (*Id.* ¶ 23).  They also knew that inmates sometimes used the IPS hotline to harass other inmates.  (*Id.*).

### 2.  The Non-Contact Visiting Room

On September 17, Jackson was involved in a fight in which he was seriously injured.  (Def. SMF ¶ 17).  As a result, he was transferred to the Health Services Unit.  (*Id.*).  Because he was transferred to the HSU, his visits the next day were to be non-contact visits.  (*Id.*).

Non-contact visits for HSU inmates are held in the prison's non-contact visiting room.  (*Id.*).  In that room, visitors and prisoners are separated by a glass barrier.  (Pl. SMF ¶ 6).  A small metal device in the center of the glass allows sound to pass through.  (*Id.*).

On previous occasions, visitors in non-contact visiting rooms had smuggled drugs to inmates.  (Def. SMF ¶ 2).  For example, visitors had sometimes removed the rubberized caulking around the windows and slipped drugs through the openings; funneled the drugs through the round metal speaker piece using a straw; or taped the drugs to the bottom of a chair on the visitor's side to be picked up by another inmate.  (*Id.*).  The SBCC staff had taken measures to prevent visitors from using those tactics to deliver drugs to inmates.  (Thomas Dep. at 24-26).

There is no surveillance, supervision, or monitoring equipment in the non-contact visiting room.  (Pl. SMF ¶ 26).  There are no officers stationed in the room to observe the visitors and prisoners during non-contact visits, and there are no video or audio recording devices to monitor

communications.  (*Id.*).

### 3.    Zenaida Hernandez's Visit

Zenaida Hernandez is a resident of New Bedford, Massachusetts.  (Pl. SMF ¶ 1).  She is originally from Puerto Rico and primarily speaks Spanish.  (*Id.*).

In 2009, a mutual friend introduced Hernandez to Jackson by showing her a picture of him; they subsequently began corresponding by mail.  (*Id.* ¶ 3).  After several months, she agreed to visit Jackson at SBCC.  (*Id.*).  Hernandez visited Jackson several times without incident.  (*Id.*).

On September 18, 2011, Hernandez arrived at SBCC at around 1:00 p.m. to visit Jackson.  (*Id.* ¶ 2).  To enter the prison, she successfully passed through a security checkpoint.  (*Id.* ¶ 4).  At the checkpoint, she was required to remove her shoes, empty her pockets, pass through a metal detector, open her mouth for visual inspection, and move her collar, shirt sleeves, pant legs, and feet so they could be inspected.  (*Id.*).  Hernandez was then escorted into the non-contact visiting room on the third floor.  (*Id.* ¶ 5).

The IPS team's plan had been to intercept Hernandez before her meeting with Jackson.  (Def. SMF ¶ 18).  However, the officers working in the lobby were not told that ISP should be informed if a visitor for Jackson arrived.  (Verdini Dep. at 54-56).

Verdini arrived at SBCC sometime around noon.  (*Id.* at 54-55).  When he called down to the visitor's center to tell them to let him know if a visitor came for Jackson, the officer at the center told him the visitor had already arrived.  (*Id.* at 55).

When Hernandez arrived at the SMU visiting room, she saw that Jackson was seriously injured.  (Pl. SMF ¶ 9).  His face appeared swollen and disfigured and he had an intravenous

tube taped to his arm.  (*Id.*).  Hernandez had not known Jackson had been injured and became very nervous after seeing him.  (*Id.*).

Sometime between 1:00 and 1:30 p.m., Verdini, Thomas, and IPS Officer Carlos Goden entered the SMU visiting room.  (Def. SMF ¶ 21).  They saw Hernandez visiting with Jackson. (*Id.*).  The officers did not monitor Hernandez to see if she was attempting to pass Jackson contraband.  (Pl. SMF ¶ 27).  They observed no suspicious behavior when they entered the room. (*Id.* ¶ 28).

Thomas told Hernandez, in English, that her visit had been terminated.  (Def. SMF  ¶ 21). He also told her something to the effect of, "Ma'am, we need you to come with us.  We need to speak to you."  (Thomas Dep. at 50).  The officers then escorted Hernandez out of the visiting room.  (Pl. SMF ¶ 12).  Prison officials did not search Jackson or the visiting room after Hernandez's visit ended.  (*Id.* ¶ 29).

### 4.      The Interview in the Roll-Call Room

After terminating her visit, Verdini, Thomas, and Goden escorted Hernandez from the visiting room to the lobby.  (Def. SMF ¶ 22).  During the walk, Hernandez asked the officers, "What's going on?" several times in English.  (*Id.*).  Thomas told her in English that he would discuss the matter later.  (*Id.*; Goden Dep. at 25-26).[2]  After Hernandez repeated herself several times, Goden told her, in Spanish, that they would explain what was happening after they brought her to the prison's roll-call room.  (Goden Dep. at 26).

When they reached the lobby, a female corrections officer, Maria Montanez, joined them.

---

[2] Neither Verdini nor Thomas speaks Spanish.  (Def. SMF ¶ 31).  Goden speaks fluent Spanish.  (*Id.*).

(Pl. SMF ¶ 13).  Montanez accompanied them to the roll-call room.  (*Id.*).[3]

Once inside the roll-call room, Hernandez sat at a table.  (*Id.* ¶ 30).  Verdini and Thomas sat across from her at the table.  According to Hernandez, Goden and Montanez stood between her and the door.  (*Id.*).[4]  One of the officers stood at the door, blocking the exit.  (*Id.*).  The door was closed, but not locked.  (*Id.*).

Verdini and Thomas began asking Hernandez questions, in English, about drugs.  (*Id.* ¶ 31).  Goden interpreted the questions into Spanish.  (*Id.*).  According to defendants, the conversation was polite in tone, and Hernandez was cooperative.  (Def. SMF ¶ 38).  Verdini and Thomas asked Hernandez if she had brought drugs for Jackson.  (Pl. SMF ¶ 31).  According to Hernandez, they also told her she would have to sign a paper so they could search her for drugs.  (*Id.*).[5]

Hernandez was scared and nervous.  (Hernandez Dep. at 79).  She asked the officers why she had to sign the paper because she did not have any drugs on her.  (*Id.* 81).  According to Hernandez, Goden told her that she would "have to wait for an attorney" if she did not give her consent.  (*Id.*; Pl. SMF ¶ 31).  According to Hernandez, she also "thought they were going to . . . put [her] in jail" if she did not give her consent.  (Hernandez Dep. at 81).  Verdini or Thomas told her, through Goden, that if she did not sign the paper and did not "go by the rules that one had to do," she would "have to get an attorney."  (*Id.* at 87).  No one told her that she was free to

---

[3] Defendants contend that Montanez accompanied them because, under SBCC policy, a female officer must be present at an interview of a female visitor.  (Def. SMF ¶ 27).  Montanez speaks fluent Spanish.  (*Id.* ¶ 31).

[4] Defendants contend that Goden and Montanez were standing in close proximity to Hernandez, off to the side.  (Def. SMF ¶ 30).

[5] According to defendants, they asked if Hernandez was willing to consent to a strip search.  (Def. SMF ¶ 35).

leave.  (*Id.* at 89).  She did not ask to leave, or indicate that she wanted to leave.  (Def. SMF ¶¶ 40, 46).  One of the officers also told her that they would search Jackson for drugs and arrest her if they found drugs on him.  (Pl. SMF ¶ 32).

The questioning lasted from ten to twenty-five minutes.  (*Id.* ¶ 34; *see also* Def. SMF ¶ 37).  At that point, Hernandez believed her options were to sign a piece of paper consenting to a search or go to jail.  (Hernandez Dep. at 81; Pl. SMF ¶ 35).  According to Hernandez, she agreed to sign the paper because she was "desperate to try to leave."  (Hernandez Dep. at 83).

Verdini then left the roll-call room to call IPS Commander Cruz and request permission to strip-search Hernandez.  (Pl. SMF ¶ 38).  He told Cruz that Hernandez had voluntarily consented to the search.  (*Id.*).  Cruz contacted Superintendent Mendonsa to receive permission for the search.  (*Id.* ¶ 39).[6]  Mendonsa approved the search.  (*Id.* ¶ 40).  That process took thirty to forty-five minutes.  (*Id.* ¶ 41).  During that time, Thomas, Goden, and Montanez remained in the roll-call room with Hernandez.  (*Id.*).  She was not permitted to leave.  (*Id.*).

At some time before 2:40 p.m., Cruz called Verdini and told him that the superintendent had authorized the strip-search.  (*Id.* ¶ 42; Def. SMF ¶ 56).  He retrieved the prison's strip-search log book from the lobby and brought it to the roll-call room.  (Pl. SMF ¶ 42).  Montanez opened the log book to a page and told Hernandez where to sign her name.  (*Id.*).

The page in the log Hernandez signed contained only handwritten columns for "civilian name," "civilian signature," "officer name," "officer signature," "date," and "time."  (*Id.* ¶ 43).  The page did not say that signing the log book indicated consent to a strip-search.  (*Id.*).  The log book contains no information about a person's rights when asked to consent to a strip-search and

---

[6] Permission from the superintendent is a requirement for strip-searches at SBCC.  (Def. SMF ¶ 49).

does not tell visitors they have the right to refuse.  (*Id.*).  Hernandez was not shown any other part of the log book or any other documents.  (*Id.*).

At 2:40 p.m., Hernandez signed the log book.  (*Id.* ¶ 44).  The officers then escorted her from the roll-call room into a small, windowless, triangular-shaped room in the corner of the lobby for the strip-search.  (*Id.* ¶ 45).

### 5. The Strip-Search

Montanez and a second female corrections officer, Jacqueline Balutis, escorted Hernandez into the room.  (Pl. SMF ¶ 45).  They stood between Hernandez and the door.  (*Id.*). Montanez told Hernandez to take off her clothes.  Hernandez asked her why she had to take off her clothes.  (Hernandez Dep. at 94-95).  Montanez told her that because she had signed the log book, she had to comply with a strip-search.  (*Id.*).  According to Hernandez, nobody had told her until this point that she had consented to a strip-search.  (*Id.* at 91-92).

Hernandez was very nervous but cooperated because Montanez told her she had to comply.  (Pl. SMF ¶ 47).  After she had taken off all her clothes except her underwear, she told Montanez she was having her menstrual period.  (*Id.*).  Montanez told her that she would have to remove her underwear and menstrual pad for inspection, and that she would be provided toilet paper after the search was over.  (*Id.*).

Hernandez stripped completely naked and removed her menstrual pad.  (Pl. SMF ¶ 48). Montanez then told her to bend over and spread her buttocks so Montanez could inspect her vaginal and anal cavities.  (*Id.*).  Hernandez did not ask for the search to stop, but said "oh, God" during the search.  (Hernandez Dep. at 95).  She was also trembling throughout the search.  (*Id.* at 97).  The search uncovered no contraband.  (Pl. SMF ¶ 50).

The strip-search took approximately fifteen minutes.  (Def. SMF ¶ 72).  After the search, Hernandez was given toilet paper and got dressed.  (*Id.* ¶ 51).  Montanez escorted her to the lobby where she was then permitted to leave.  (*Id.*).

### B.      Procedural Background

On June 15, 2012, plaintiff filed the complaint in this case, bringing claims under 42 U.S.C. § 1983; the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12 § 11I; and the Massachusetts Privacy Act, Mass. Gen. Laws ch. 214 § 1B.  On February 18, 2014, defendants filed a motion for summary judgment.  They contend that they did not violate the Fourth Amendment or the MPA, and that they are entitled to qualified immunity on the federal and state civil rights claims.

## II.      Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (internal quotations omitted).  The non-moving party may not simply "rest upon mere

allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at

256-57.

## III.    Analysis

### A.    Claim under 42 U.S.C. § 1983

Section 1983 "creates a private right of action for redressing abridgements or

deprivations of federal constitutional rights."  *McIntosh v. Antonino*, 71 F.2d 29, 33 (1st Cir.

1995).  "A claim under § 1983 has two 'essential elements':  the defendant must have acted

under color of state law, and his or her conduct must have deprived the plaintiff of rights secured

by the Constitution or by federal law."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008).

Here, it is not disputed that defendants are state actors being sued for actions taken pursuant to

their official duties; the issue is solely whether their actions deprived plaintiff of her

constitutional rights.

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable

searches and seizures."  Plaintiff contends that defendants violated that right by (1) unlawfully

seizing her when they detained her in the roll-call room and (2) unlawfully strip-searching her

without legal authority.

Although the Fourth Amendment applies to stops and detentions short of arrest, its

"constitutional guarantee is violated only if the detention is unreasonable."  *Brennan v.*

*Hendrigan*, 888 F.2d 189, 192 (1st Cir. 1989).  "Where the stop and interrogation comprise more

of an intrusion, and the government seeks to act on less than probable cause, a balancing act

must be applied.  The touchstone, of course, is reasonableness." *Id.* (quoting *Lopez v. Aran*, 844

F.2d 898, 905 (1st Cir. 1988)).

The Fourth Amendment reasonableness inquiry is affected by the context where the

search or seizure took place.  As the First Circuit has explained:

> Although a generous amount of deference is given to prison officials on matters of prison
> safety, security, and discipline, it is clear that visitors do not relinquish their Fourth
> Amendment rights at the prison gates.  Prison visitors retain the right to be free from
> unreasonable searches and seizures.  The meaning of "reasonableness" for Fourth
> Amendment purposes is highly situational.  . . .  The standard of "reasonableness" that
> governs searches [and seizures] in a given context depends, in general, upon a balancing
> of the need to search [or seize] against the invasion which the search [or seizure] entails.

*Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996) (internal quotations and citations omitted).

"The components of this balancing test are '[1] the gravity of the public concerns served by the

[search or] seizure, [2] the degree to which the [search or] seizure advances the public interest,

and [3] the severity of the interference with individual liberty.'"  *Brennan*, 888 F.2d at 193

(quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

In *Wood*, the First Circuit discussed the gravity of the public concerns served by prison

searches and seizures:

> In the volatile context of a prison, the need to preserve internal security is very strong.
> Prison officials may well have a need to search [and seize] visitors in some manner in
> order to prevent the smuggling of contraband (such as drugs or weapons) to inmates.  On
> the other side of the balance, people naturally have a diminished expectation of privacy
> when they enter a prison, and so those visiting a prison cannot credibly claim to carry
> with them the full panoply of rights they normally enjoy.

*Wood*, 89 F.3d at 928.

### 1.      **Whether Plaintiff Was Subject to an Unlawful Seizure**

"'[A] person has been seized within the meaning of the Fourth Amendment only if, in

view of all the circumstances surrounding the incident, a reasonable person would have believed

12

that he was not free to leave.'"  *United States v. Ford*, 648 F.3d 1, 4 (1st Cir. 2008) (quoting

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  "To constitute seizure, this Circuit

requires one's liberty to be restrained by either physical force or an assertion of authority."  *Id.*

The inquiry is based on the "objective totality of the circumstances," and looks "not to 'whether

the citizen perceived that he was being ordered to restrict his movement, but whether the

officer's words and actions would have conveyed that to a reasonable person.'"  *Id.* at 5 (quoting

*California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

　　　　Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may in appropriate

circumstances and in an appropriate manner approach a person for purposes of investigating

possibly criminal behavior even though there is no probable cause to make an arrest" without

violating the Fourth Amendment.  392 U.S. at 22.  A *Terry* stop is valid if law enforcement

officers "have a reasonable suspicion that criminal activity is afoot."  *United States v. Dapolito*,

713 F.3d 141, 147 (1st Cir. 2013) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and

*Terry*, 392 U.S. at 30).  As the *Dapolito* court explained:

> Reasonable suspicion requires there be both a particularized and an objective basis for
> suspecting the individual stopped of criminal activity.  The particularity requirement
> demands that the finding be grounded in specific and articulable facts.  The objective
> requirement dictates that [the Court] view the circumstances through the lens of a
> reasonable police officer.

*Id.* (internal quotations and citations omitted).

　　　　Plaintiff does not contend that the termination of her inmate visit and her transfer to the

roll-call room was an unlawful seizure.  Instead, plaintiff contends that her presence in the roll-

call room turned into an unlawful seizure without probable cause at some point during the

interview.  She contends that the reasonable person in her situation would not have felt free to

leave when the officers blocked the door and told her she would have to either consent to be searched or obtain a lawyer.

"Evaluating whether the scope of an investigatory stop is reasonable . . . means weighing, among other things, 'the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion.'" *United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011).  The appropriate length of a stop "is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to . . . confirm or dispel [their] suspicions." *Id.* at 31.

Assuming the initial investigatory stop was lawful, defendants' questioning of plaintiff for ten to twenty-five minutes was reasonable to determine whether she had brought drugs into the prison. *See United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999) (upholding fifty-minute stop and stating that "[a] long duration . . . does not by itself transform an otherwise valid stop into an arrest").  The fact that one of the corrections officers appeared to have blocked the door did not turn the encounter into an unreasonable seizure. *See United States v. Jones*, 700 F.3d 615, 625 (1st Cir. 2012) ("[M]easures such as . . . police cruisers positioned to block exits[] do not necessarily turn a stop into a de facto arrest.").

Plaintiff further contends that because defendants coerced her into consenting to a search and held her for more than an hour, her detention became an unlawful seizure.  Her continued detention was preparatory to her strip-search, and thus is reasonable only if the strip-search was reasonable.  The Court will therefore turn to that analysis.

## 2.   Whether Plaintiff Was Subject to an Unlawful Search

Under First Circuit precedent, "prison officials violate the Fourth Amendment when they

undertake a strip search of a prison visitor without reasonable suspicion of circumstances that justify the search." *Wood*, 89 F.3d at 929. "At minimum, the reasonable suspicion standard requires that the decision to search be based on articulable factual information bearing at least some indicia of reliability." *Id.* Consent is irrelevant to the legal analysis; "a prison visitor confronted with the choice between submitting to a strip-search or foregoing a visit cannot provide a 'legally cognizable consent.'" *Cochrane v. Quattrocchi*, 949 F.2d 11, 13 (1st Cir. 1991) (quoting *Blackburn v. Snow*, 771 F.2d 556, 567 (1st Cir. 1985)); *Wood*, 89 F.3d at 927 n.3.

Defendants contend that they had reasonable suspicion to authorize the strip-search because (1) they knew of the anonymous tip from the IPS hotline; (2) they knew Jackson's history with drugs, including a past incident where one of Jackson's female visitors was found in possession of marijuana; and (3) they knew that Jackson's visit would be held in a non-contact visiting room, where visitors had previously delivered drugs to inmates. Defendants acknowledge that they received no further facts that supported their suspicion from plaintiff's visit to the prison or her interview in the roll-call room.

"Although an anonymous tip, standing alone, may typically fail to create reasonable suspicion, an anonymous tip that is corroborated in some measure by actual facts or by other sources may be enough." *Wood*, 89 F.3d at 929. In *Wood*, reasonable suspicion for a strip-search was "based on a tip [the defendant] believed had been received from two unconnected yet mutually corroborating confidential informants, both of whom [he] believed had made the highly specific allegation that visitors were hiding drugs in an infant's booties for an inmate who was

serving time for a drug conviction." *Id.* at 931.[7]  The court in *Wood* found that the defendant's decision to authorize the strip-searches was not objectively unreasonable.

In contrast, the court in *Cochrane* rejected the district court's conclusion that reasonable suspicion existed for a strip-search.  949 F.2d at 14.  There, the strip-search was "based on information from a reliable informant and on the uncontroverted evidence of [the prisoner's] repeated drug use while incarcerated." *Id.* at 13.  The informant's reliability was vouched for "only in the most general terms," with the defendant testifying that "the informant had, over roughly a six month period, provided reliable information regarding the introduction of narcotics and weapons into the correctional facility." *Id.* at 14.  The *Cochrane* court found that "absent any evidence that [the visitor] ever violated a prison visitation rule, or ever supplied [the inmate] with drugs, . . . the jury could have found that the strip search of appellant was unreasonable because it was based on *no* 'individualized suspicion.'" *Id.* at 13 (emphasis in original).

Construing the facts in plaintiff's favor here, defendants had no knowledge of the source of the single anonymous tip or how the source had received his information.  Unlike *Wood*, they did not believe there was a second, independent source for the information.  And there is no suggestion that the anonymous tipster had provided reliable information in the past (or, indeed, that the IPS hotline ever provided reliable information in the past).  Moreover, defendants knew that inmates sometimes used the IPS hotline to harass other inmates.  The anonymous tip, standing alone, was not sufficiently reliable, and defendants had no information to corroborate it independently.

---

[7] In *Wood*, although in reality there had been only one anonymous source for the tip, the prison superintendent reasonably relied on misinformation from one of his staff that two independent confidential informants had provided the information.  *Wood*, 89 F.3d at 925-26.

Defendants' suspicions of Jackson's drug activity are insufficient to provide adequate

corroboration of the anonymous tip.  As in *Cochrane*, defendants had knowledge of Jackson's

drug activity but had no independent suspicions that plaintiff had been the one who supplied

Jackson's drugs.  As plaintiff points out, reasonable suspicion must be "specifically directed to

the person who is targeted for the strip search."  *Cochrane*, 949 F.2d at 14 (quoting *Hunter v.

Auger*, 672 F.2d 668, 675 (8th Cir. 1982)); *see also Thorne v. Jones*, 765 F.2d 1270, 1277 (5th

Cir. 1985) ("'reasonable suspicion' must be specifically directed to the person to be searched"

(internal quotation omitted)).  The only information linking *plaintiff* to drug activity was the

anonymous tip.  Under the circumstances, that tip was not sufficiently reliable, and therefore

could not supply the reasonable suspicion necessary to conduct a lawful strip-search of a prison

visitor.  *See Cochrane*, 949 F.2d at 14.[8]

Construing the record in the light most favorable to plaintiff, defendants did not have

reasonable suspicion to conduct the strip-search.

### 3.      Whether Defendants Are Entitled to Qualified Immunity

Defendants contend that even if they lacked reasonable suspicion to conduct a strip-

search, they are protected by qualified immunity.  The doctrine of qualified immunity protects

public employees "from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether a public

employee is protected by qualified immunity, the relevant inquiries are (1) whether the facts

shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at

---

[8] Plaintiff also contends that there was no reason to search her after her visit had been terminated, citing *Marriott ex rel. Marriott v. Smith*, 931 F.2d 517 (8th Cir. 1991).  The Court does not address that contention.

issue was clearly established at the time of the defendant's alleged misconduct. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).[9]

For purposes of the second step of that analysis, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011).

Here, it is not disputed that the legal contours of a prison visitor's right to be free from unreasonable strip-searches was established in this circuit, at the latest, by 1996. *See Wood*, 89 F.3d at 929 ("[W]e now explicitly state that 'reasonable suspicion' is indeed the proper standard by which to gauge the constitutionality of prison-visitor strip searches."). Defendants contend they are entitled to qualified immunity because a reasonable officer would not have understood that plaintiff's strip-search violated her constitutional rights. They contend that under *Varrone v. Bilotti*, 123 F.2d 75 (2d Cir. 1997), they had a reasonable belief that they had reasonable suspicion to conduct the strip-search.

In *Varrone*, an assistant district attorney told prison officials that he had "received information from what he believed to be a reliable source that [the plaintiff] and his mother would be visiting [an inmate] (his father and her husband) . . . in the near future and that at that time they would be bringing heroin into the facility." 123 F.2d at 79-80. The information

---

[9] Although conducting this two-step analysis in sequence is sometimes advisable because doing so "promote[s] the development of constitutional precedent," courts have discretion to avoid the direct constitutional question when a matter may be resolved at the second step. *Maldonado*, 568 F.3d at 270.

"identified the smugglers by name, stated where and when they would commit the offense[,] and specified the particular drug they would attempt to smuggle." *Id.* (internal quotations omitted). Prison officials were also aware that the inmate was imprisoned for the sale of drugs and were investigating other alleged instances of drug smuggling into the prison. *Id.*

The plaintiff in *Varrone* was strip-searched when he next visited the institution. *Id.* at 77. In upholding the search, the Second Circuit found that the officials had reasonable suspicion to strip-search the plaintiff because the prosecutor who gave them the tip said "the information supplied came from what he believed to be a reliable source" and because the prison "was investigating other alleged instances of drug smuggling into [the prison]." *Id.* at 80-81 (internal quotations omitted).

In this case, it is undisputed that defendants did not know who gave them the tip. There is nothing in the record about the reliability of the anonymous informant, other than that he was an inmate in the institution. Defendants also knew that Jackson had enemies in the prison and that inmates often used the IPS hotline to harass other prisoners.

Although defendants had information that Jackson was involved in drug activity in the prison, they had no specific information, other than the anonymous tip, that plaintiff was involved in drug activity. *See Cochrane*, 949 F.2d at 14 (noting that reasonable suspicion must be "specifically directed to the person who is targeted for the strip search"). Furthermore, although the prison had caught one of Jackson's prior female visitors with marijuana, that incident was not related to plaintiff. Indeed, Jackson had many different female visitors. The facts casting suspicion on plaintiff, construed in her favor, "were so meager, it should have been apparent to the officials that they did not have reasonable suspicion to initiate the search." *Spear*

19

*v. Sowders*, 33 F.3d 576, 582 (6th Cir. 1994).

The Court is of course cognizant of the severity of the problem of drug smuggling into prisons, and the need for prison administrators to cope with that problem in practical and reasonable ways.  It is also cognizant that prison administrators, like law enforcement personnel generally, often have to make real-time decisions based on incomplete or otherwise imperfect information.  *See, e.g.*, *Wood*, 89 F.3d at 928.  Nonetheless, the law as to strip-searches has been clear for some time, and prison officials are charged with knowledge of that law.

In short, on this record, an objectively reasonable prison official would not have believed that he or she had reasonable suspicion to strip-search plaintiff, and would have understood that plaintiff's consent was irrelevant.[10]  Accordingly, defendant's motion for summary judgment will be denied as to plaintiff's § 1983 claim.

### B.    Massachusetts Civil Rights Act Claim

The Massachusetts Civil Rights Act provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion."  Mass. Gen. Laws ch. 12, § 11I.  The statute thus contemplates a two-part sequence:  liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he or she has the constitutional right to do.  *Goddard v. Kelley*, 629 F. Supp. 2d

---

[10] Defendants also contend that Verdini, Thomas, Goden, and Montanez are entitled to qualified immunity under *Varrone* because they were merely carrying out the orders of their supervisors.  Even if that were true, the subordinate officers in *Varrone* were only entitled "to hav[e] the same qualified immunity that the source of the order" had.  123 F.3d at 81.  Because Mendonsa, the prison superintendent, is not entitled to qualified immunity at this stage of the proceedings, the subordinate defendants are also not entitled to qualified immunity.

115, 128 (D. Mass. 2009).[11]  The MCRA affords qualified immunity to public officials to the same extent that § 1983 does.  *Rodrigues v. Furtado*, 410 Mass. 878, 881 (1991).

The direct violation of a constitutional right does not establish a MCRA violation because "it is not an attempt to force someone to do something the person is not lawfully required to do."  *Columbus v. Biggio*, 76 F. Supp. 2d 43, 54 (D. Mass. 1999) (quoting *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395-96 (1996)); *see also Longval v. Commissioner of Correction et al.*, 404 Mass. 325, 333 (1989) ("[A] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [Massachusetts Civil Rights] Act."); *Sarvis v. Boston Safe Deposit and Trust Co.*, 47 Mass. App. Ct. 86, 93 (1999) (stating that *Longval* "affirmed the requirement under the [MCRA] that proof of 'threats, intimidation, or coercion' be in addition to the interference with the exercise or enjoyment of secured rights").

Because defendants' strip-search of plaintiff was objectively unreasonable under the Fourth Amendment, plaintiff has shown an interference with her federal rights that survives a qualified-immunity defense at this stage of the proceedings.  The issue, then, is whether plaintiff has shown that the interference was a result of "threats, intimidation, or coercion."  Mass. Gen. Laws ch. 12, § 11I.  Plaintiff contends that defendants violated the MCRA by coercing her into consenting to the search.

The Massachusetts courts have not specifically addressed whether coercing a prison

---

[11] Under the statute, a threat "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; intimidation "involves putting in fear for the purposes of compelling or deterring conduct"; and coercion means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."  *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994).

visitor into consenting to a strip-search is actionable under the MCRA.  In general, "[e]ven if the manner of conducting [a] search [is] unreasonable," it does not violate the MCRA unless there is "evidence that it was conducted for an illegitimate or vindictive purpose."  *Sabree v. Conley*, 62 Mass. App. Ct. 901, 902 (2004).  In addition, it does not appear as if plaintiff's consent had any effect on whether her Fourth Amendment rights were violated.  *See Cochrane*, 949 F.2d at 13 (prison visitor cannot give legally cognizable consent when faced with a choice between submitting to a strip-search or foregoing a visit).  There are no allegations that defendants physically hurt or threatened plaintiff.  While they may have directly violated plaintiff's rights, they did not employ threats, intimidation, or coercion to do within the meaning of the MCRA.

Accordingly, defendants' motion for summary judgment will be granted as to plaintiff's MCRA claim.

### C.    Massachusetts Privacy Act Claim

The Massachusetts Privacy Act establishes "a right against unreasonable, substantial or serious interference with . . . privacy."  Mass. Gen. Laws ch. 214, § 1B.  An individual's right to privacy under the MPA can be violated if he or she is subjected to an unlawful strip-search. *Stephen v. MacKinnon*, 7 Mass. L. Rptr. 241, at *7 (Jul. 25, 1997).  When determining whether an invasion of bodily privacy has violated the statute, the Massachusetts courts balance the individual's right of privacy with the interests involved when violating that privacy.  *See Webster v. Motorola*, 418 Mass. 425, 431-35 (1994) (evaluating MPA claim where employer required employees to submit to a urinalysis for drugs by balancing employer's legitimate business interests with employees' privacy interest).

The facts as construed in the light most favorable to plaintiff show that there was no

reasonable suspicion for the strip-search.  Without reasonable suspicion, a strip-search of a prison visitor unreasonably violates an individual's statutory interest in privacy under the MPA. *Cf. Stephen*, 7 Mass. L. Rptr. 241, at *5-7 (MPA violation where prison officials had reasonable suspicion to strip-search prison visitor but did not follow prison regulations).  Accordingly, defendants' motion for summary judgment will be denied as to plaintiff's MPA claim.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to plaintiff's MCRA claim (Count 2), and DENIED as to the remaining claims.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: May 2, 2014                United States District Judge